## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| IN RE: ECONAZOLE CASES<br><br>THIS DOCUMENT RELATES TO:<br><br>*ALL ECONAZOLE DIRECT PURCHASER ACTIONS* | HON. CYNTHIA M. RUFE<br><br>LEAD CASE: 16-EC-27240<br>DIRECT CASE: 16-EC-27241<br><br>JURY TRIAL DEMANDED |
| AHOLD USA, INC.; CÉSAR CASTILLO, INC.; FWK HOLDINGS, L.L.C.; KPH HEALTHCARE SERVICES, INC., a/k/a KINNEY DRUGS, INC.; and ROCHESTER DRUG CO-OPERATIVE, INC.; on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>PERRIGO NEW YORK, INC.; TARO PHARMACEUTICALS U.S.A., INC.; and TELIGENT, INC.<br><br>     Defendants. | |

## <u>CONSOLIDATED AMENDED DIRECT PURCHASER CLASS ACTION COMPLAINT</u>

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................ 1

II.   JURISDICTION AND VENUE ........................................................ 8

III.  PARTIES ........................................................................................... 9

      A.   Plaintiffs ................................................................................... 9

      B.   Defendants ............................................................................... 10

      C.   Co-Conspirators ...................................................................... 11

IV.   INTERSTATE TRADE AND COMMERCE ................................. 12

V.    FACTUAL ALLEGATIONS ........................................................... 13

      A.   Competition Between Generic Drugs Historically Has Been Keen. .................... 13

            1.   Generic drugs should lead to lower prices. ................................ 13

            2.   Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive. .............. 16

      B.   Defendants' Conspired to, Among Other Things, Fix and Raise Econazole Prices. 19

            1.   Defendants' dominance over Econazole sales permitted them to fix prices, and their abrupt price increases are otherwise inexplicable. ..................... 19

            2.   Teligent acquires Econazole from Prasco. ................................ 20

            3.   Defendants' collective market dominance permitted them to collude. ....... 22

            4.   Defendants' effective prices were relatively stable before skyrocketing in the Class Period. ......................................................... 22

            5.   As part of the conspiracy, Defendants increased their WAC benchmarks in lockstep. ................................................................ 28

            6.   There are no shortages or other market changes that would justify Defendants' price increases. ................................................. 29

      C.   Defendants Orchestrated Their Conspiracy Through In-Person Meetings and Other Forms of Communication. ............................................. 30

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

|   |   | 1. | Investor communications demonstrate Defendants' intent to fix and maintain supra-competitive prices to realize record profits | 44 |

1. Investor communications demonstrate Defendants' intent to fix and maintain supra-competitive prices to realize record profits...................44

2. Industry commentary indicates collusion is a plausible explanation for the increase in Econazole price......................................................48

D. Defendants' Conduct in Generic Drug Pricing Is Under Investigation by the United States Congress, the DOJ, and the State Attorneys General....................49

1. Congress launched an investigation in response to news reports of a dramatic rise in price of certain generic drugs...........................................49

2. The DOJ launched a broad criminal investigation into anticompetitive conduct by generic drug manufacturers.....................................................51

3. Led by the State of Connecticut, the Plaintiff States launched their own investigation of antitrust violations in the generic drug industry. .............56

VI. THE EXISTENCE OF THE FAIR SHARE AGREEMENT WITHIN THE GENERIC DRUG INDUSTRY AND AS TO ECONAZOLE IS SUPPORTED BY OTHER FACTORS.................................................................................................................57

VII. CLASS ACTION ALLEGATIONS .........................................................................58

VIII. ANTITRUST INJURY .............................................................................................60

IX. CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN ACT......61

X. PRAYER FOR RELIEF ...........................................................................................62

XI. JURY TRIAL DEMANDED.....................................................................................63

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

## I.   INTRODUCTION

1.      Plaintiffs Ahold USA, Inc., César Castillo, Inc., FWK Holdings, L.L.C., KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc., and Rochester Drug Co-Operative, Inc., on behalf of themselves and all others similarly situated, bring this Consolidated Amended Class Action Complaint on behalf of a Class (defined below) of direct purchasers who purchased generic econazole nitrate 1% cream (15, 30, or 85 gm) ("Econazole") directly from Defendants Perrigo New York, Inc., Taro Pharmaceuticals U.S.A., Inc., and Teligent, Inc.

2.      In the pharmaceutical industry, the entry of generic versions of branded drugs usually results in aggressive price competition, which in turn reduces prices for drug wholesalers, retail pharmacies, consumers, and third-party payors.  Defendants here, however, conspired to thwart the economic benefits of generic competition.

3.      This is a civil action seeking treble damages arising out of the Defendants' unlawful scheme to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Econazole.  As set forth below, Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants were not alone in subverting the operation of a competitive marketplace for generic pharmaceuticals.  Defendants' anticompetitive conduct in the Econazole market is part of a larger "Fair Share" conspiracy or series of conspiracies involving many generic pharmaceutical manufacturers and many generic pharmaceuticals.[1]

---

[1] *See* Direct Purchasers' First Amended Class Action Complaint ("DPPs' Heritage-Related Multi-Drug Complaint"), No. 2:18-cv-02641 (filed simultaneously with this Amended Complaint) at Exhibit A (MDL 2724 Generic Drugs as of December 2018).  In sustaining allegations concerning Econazole and other generic drugs, the Court noted allegations that "Defendants engaged in anticompetitive conduct that was part of a larger conspiracy or series of conspiracies involving many generic pharmaceutical manufacturers and many generic pharmaceuticals," *In re Generic Pharm. Pricing Antitrust Litig.*, --- F. Supp. 3d ---, 2018 WL 5003450, at *1 (E.D. Pa. Oct. 16, 2018), and that government investigations "have uncovered the existence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States." *Id.* at *9.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

4.      Plaintiffs' allegations are based on personal knowledge of these matters relating to themselves and upon information and belief as to other matters.  Parts of Plaintiffs' allegations are based on information made public during ongoing government investigations of Defendants and other generic pharmaceutical companies for alleged unlawful price-fixing and other conduct in the generic pharmaceutical industry.

5.      Econazole is an antifungal topical cream used to treat a variety of skin infections including tinea pedis, tinea cruris, tinea corporis, cutaneous candidiasis, and pityriasis versicolor.

6.      Econazole has been available in the United States for almost 20 years and the market for Econazole is mature.  Defendants dominate the market for Econazole.

7.      Beginning at least as early as July 2014 and continuing today (the "Class Period"), Defendants and co-conspirators engaged in an anticompetitive scheme as to Econazole to artificially inflate prices through unlawful agreements.  Defendants caused the price of these products to dramatically and inexplicably increase as much as ███████ higher than June 2014 prices, as alleged in Section V(B)(3) herein.  The United States Government Accountability Office ("GAO") singled out Econazole as an example of a generic pharmaceutical that "experienced an extraordinary price increase."[2]  This increase was the consequence of an agreement among Defendants to increase pricing and restrain competition for the sale of Econazole in the United States.  Defendants orchestrated their Fair Share Agreement through secret communications and meetings, both in private and at public events, such as trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now called the

---

[2] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 2016), *available at* http://www.gao.gov/assets/680/ 679055.pdf.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Association for Accessible Medicines),[3] the Healthcare Distribution Management Association

("HDMA") (now called the Healthcare Distribution Alliance), the Minnesota Multistate

Contracting Alliance for Pharmacy ("MMCAP"), the National Association of Chain Drug Stores

("NACDS"), Efficient Collaborative Retail Marketing ("ECRM"), and the National Pharmacy

Forum ("NPF"), among others.

      8.     Defendants' and other generic pharmaceutical manufacturers' conduct has

resulted in extensive scrutiny by federal and state regulators, including by the Civil and Antitrust

Divisions of the United States Department of Justice ("DOJ"), the United States Senate, the

United States House of Representatives, and almost all of the State Attorneys General (the

"Plaintiff States").[4]  The DOJ empaneled a federal grand jury in this District, which has issued

subpoenas relating to price-fixing and other anticompetitive conduct in the generic

pharmaceutical industry, including to Defendants Perrigo and Taro.[5]

      9.     The DOJ's and Plaintiff States' investigations followed a congressional hearing

and investigation prompted by the National Community Pharmacists Association's ("NCPA")

January 2014 correspondence to the United States Senate Health Education Labor and Pensions

("HELP") Committee and the United States House Energy and Commerce Committee requesting

---

[3] *See* Russell Redman, *New name for Generic Pharmaceutical Association*, CHAIN DRUG REVIEW (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-generic-pharmaceutical-association/.

[4] DPPs' Heritage-Related Multi-Drug Complaint Exhibit B (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry).

[5] DPPs' Heritage-Related Multi-Drug Complaint Exhibit C (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena Relating to Anticompetitive Conduct in the Generic Drug Industry).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

hearings on significant spikes in generic pharmaceutical pricing.[6]  The NCPA's news release reported price hikes on essential generic pharmaceuticals exceeding 1,000% in some instances, according to its survey of over a thousand community pharmacists, resulting in some patients being forced to leave their prescriptions at the pharmacy counter due to increased copays, and forcing more seniors into Medicare's coverage gap (or "donut hole") where they must pay far higher out-of-pocket costs.

10.     On December 12 and 13, 2016, the DOJ filed its first criminal charges against two former executives of Heritage Pharmaceuticals: Jeffrey Glazer and Jason Malek.  *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.). The DOJ alleged that both Glazer and Malek conspired with others "to allocate customers, rig bids, and fix and maintain prices" of generic glyburide and doxycycline sold in the United States.  Each was charged with two felony counts under the Sherman Act, 15 U.S.C. § 1.  On January 9, 2017, both Glazer and Malek pleaded guilty to the charges.  They continue to cooperate with the DOJ's ongoing investigation as they await sentencing.

11.     The DOJ has publicly acknowledged that its investigation overlaps with MDL 2724.  For example, the DOJ filed a motion for a stay of discovery in MDL 2724 noting that:

> Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue here).[7]

---

[6] News Release, *Generic Drug Price Spikes Demand Congressional Hearing, Pharmacists Say* (Jan. 8, 2014), *available at* http://www.ncpanet.org/newsroom/news-releases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say.

[7] *See* Intervenor United States' Motion to Stay Discovery, *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

12.     The Plaintiff States separately represented to this Court that:

> To date Plaintiff States have identified evidence of illegal
> agreements relating to nearly 200 additional drugs – and that
> number is expected to increase as the investigation develops
> further.     For some [generic drug] manufacturers, the
> anticompetitive agreements affect most, if not all, of the products
> they sell.[8]

13.     The DOJ has also continued to issue subpoenas.  For example, in April 2018,

Aceto Corporation (which acquired certain generic products from MDL Defendant Citron)

reported that:

> In connection with the DOJ's ongoing investigation into marketing
> and pricing practices throughout the generic pharmaceutical
> industry, Aceto Corporation (the "Company") received a subpoena
> from the Antitrust Division of the U.S. Department of Justice (the
> "DOJ"). The Company is one of many operating companies in the
> generic pharmaceutical industry to receive a subpoena from the
> DOJ relating to its years-long investigation into the industry. The
> Company is currently preparing its response to the subpoena.[9]

14.     In May 2018, generic manufacturer Mallinckrodt plc reported that it too had

received a subpoena:

> *Generic Pricing Subpoena.* In March 2018, the Company received
> a grand jury subpoena issued by the U.S. District Court for the
> Eastern District of Pennsylvania pursuant to which the Antitrust
> Division of the Department of Justice is seeking documents

---

[8] Opp. by Plaintiff States Connecticut and New York to Certain Defs.' Mot. to Enforce the Court's Procedural and Discovery Orders, MDL Doc. No. 600 (filed May 31, 2018), at 7-8; *id.* at 3 ("Plaintiff States' ongoing investigation . . . is much broader [than the 15 Heritage-focused drugs in the Plaintiff States' Heritage-Related Multi-Drug Complaint] and has greatly expanded since filing the Consolidated Complaint in October 2017.  Plaintiff States are currently investigating collusive conduct relating to nearly 200 additional drugs – and expect to file one or more additional lawsuits based on that conduct at the appropriate time.  A large majority of the conduct under investigation is not the subject of any action pending in this MDL."); *id.* at 4 ("the additional potential corporations and individuals involved in this collusion vastly exceed those named in the Consolidated Complaint [] [and] the time periods of the collusion being investigated often differs significantly from the time periods of the collusion in the Consolidated Complaint").

[9] Aceto Corporation 10-Q (filed on May 7, 2018).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

regarding generic products and pricing, communications with
generic competitors and other related matters. The Company is in
the process of responding to this subpoena, and the Company
intends to cooperate fully in the investigation.[10]

15.     In April 2018, MDL Defendant Impax received a civil investigative demand

("CID") from the DOJ "regarding the pricing and sale of Impax's pharmaceuticals and Impax's

interactions with other generic pharmaceutical manufacturers."[11]

16.     In June 2018, Defendant Taro and MDL Defendant Dr. Reddy's separately

reported in SEC filings that they had recently received CIDs from the DOJ:

> On May 10, 2018, Taro U.S.A. received a Civil Investigative
> Demand from the United States Department of Justice pursuant to
> the False Claims Act seeking information relating to corporate and
> employee records, generic pharmaceutical products and pricing,
> communications and/or agreements with competitors and others
> regarding the sale of generic pharmaceutical products, and certain
> other related matters. Taro U.S.A. is in the process of reviewing
> and responding to the Civil Investigative Demand.[12]
>
> On May 15, 2018, Dr. Reddy's Laboratories, Inc. received a Civil
> Investigative Demand from the Civil Division of the U.S. DOJ,
> enquiring whether there have been any violations of the U.S. False
> Claims Act, arising from allegations that generic pharmaceutical
> manufacturers, including us, have engaged in market allocation or
> price fixing agreements, or paid illegal remuneration, and caused
> false claims to be submitted in violation of the said Act. We intend
> to fully cooperate with the DOJ in responding to the demand and
> cooperate with the investigation.[13]

17.     In August 2018, MDL Defendants Lannett, Mylan, and Teva separately reported

in SEC filings that they had also recently received CIDs from the DOJ:

> The Company [Lannett] received a Civil Investigative Demand
> ("CID") from the Department of Justice on May 14, 2018. The
> CID requests information regarding allegations that the generic

---

[10] Mallinckrodt plc 10-Q (filed on May 8, 2018).

[11] Amneal Pharmaceuticals 10-Q (filed on Nov. 7, 2018).

[12] Taro 20-F (filed on June 21, 2018).

[13] Dr. Reddy's 20-F (filed on June 15, 2018).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

pharmaceutical industry engaged in market allocation, price fixing, payment of illegal remuneration and submission of false claims. The CID requests information from 2009-present. The Company is in the process of responding to the CID.[14]

On May 10, 2018, a subsidiary of Mylan N.V. received a civil investigative demand from the Civil Division of the DOJ seeking information relating to the pricing and sale of its generic drug products.[15]

In May 2018, Teva received a civil investigative demand from the U.S. Department of Justice Civil Division, pursuant to the federal False Claims Act, seeking documents and information produced since January 1, 2009 relevant to the Civil Division's investigation concerning allegations that generic pharmaceutical manufacturers, including Teva, engaged in market allocation and price-fixing agreements, paid illegal remuneration, and caused false claims to be submitted in violation of the False Claims Act. Teva is cooperating fully with this subpoena.[16]

18.     In November 2018, MDL Defendant Par reported in SEC filings that it too had received a CID from the DOJ.[17]

19.     During a rare public comment on the DOJ's investigation at the American Bar Association's May 2018 Antitrust in Healthcare Conference, a DOJ official stated:

[T]he Division's focus on detecting and deterring collusion in crucial industries for U.S. consumers includes an investigation into price fixing, bid rigging, and market allocation agreements in the generic pharmaceuticals industry. Millions of Americans purchase prescription drugs every year to treat acute and chronic health conditions. In 2017, for example, nearly 3.9 billion generic prescriptions were dispensed, accounting for 89% of all prescriptions filled in the United States, but only 26% of drug spend. Because so many Americans rely on access to these generic drugs as a more affordable alternative to brand-name drugs, it is critical that those markets remain competitive.

---

[14] Lannett 10-K (filed on Aug. 28, 2018).

[15] Mylan 10-Q (filed on Aug. 8, 2018).

[16] Teva 10-Q (filed on Aug. 2, 2018).

[17] Endo International 10-Q (filed on Nov. 8, 2018).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

> In recent years, however, there have been large price spikes for certain generic drugs – and the Division's investigation into this market has revealed that some corporations and executives have sought to enrich themselves at the expense of consumers who rely on these critical medications. It is hard to imagine a more brazen antitrust crime than colluding to take money out of the pockets of seniors and others whose health depends on prescription drugs.
>
> The Division filed its first charges in this investigation in late 2016. Two executives, the former CEO and former president of a generic pharmaceutical company, were charged with price fixing, bid rigging and customer allocation for an antibiotic and a drug used to treat diabetes. Both have pleaded guilty and both have agreed to cooperate in the Antitrust Division's investigation, which is ongoing.[18]

20.    As a result of Defendants' scheme to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of generic drugs including Econazole, direct purchasers paid, and continue to pay, supra-competitive prices for Econazole.

21.    Plaintiffs, on behalf of themselves and members of a direct purchaser class, seek damages caused by Defendants' and co-conspirators' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II.    JURISDICTION AND VENUE

22.    This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

23.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d), because during the Class Period Defendants transacted business throughout the United States, including in this District, Defendants resided, were found, or had

---

[18] Barry Nigro, Principal Deputy Assistant Attorney General, DOJ Antitrust Division, Keynote Remarks at the American Bar Association's Antitrust in Healthcare Conference (May 17, 2018).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

24.     During the Class Period, Defendants sold and distributed generic pharmaceuticals in a continuous and uninterrupted flow of interstate commerce, which included sales of Econazole in the United States, including in this District.  Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

25.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the selling and distribution of Econazole throughout the United States, including in this District; (c) had and maintained substantial contacts within the United States, including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate prices for Econazole that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### III.     PARTIES

**A.     Plaintiffs**

26.     Plaintiff Ahold USA, Inc. ("Ahold") is a Maryland corporation with its principal places of business in Quincy, Massachusetts and Carlisle, Pennsylvania.  During the Class Period, Ahold purchased Econazole directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, Ahold paid supra-competitive prices for its Econazole purchases and was injured by the illegal conduct alleged herein.

27.     Plaintiff César Castillo, Inc. ("CCI") is a Puerto Rico corporation with its principal place of business in Rio Piedras, Puerto Rico.  During the Class Period, CCI purchased Econazole directly from one or more Defendants.  As a result of Defendants' antitrust

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

conspiracy, CCI paid supra-competitive prices for its Econazole purchases and was injured by the illegal conduct alleged herein.

28.     Plaintiff FWK Holdings, LLC ("FWK") is an Illinois corporation with its principal place of business in Glen Ellyn, Illinois.  FWK is the assignee of antitrust claims possessed by Frank W. Kerr Company ("Kerr") and brings this action as successor-in-interest to Kerr's claims arising from its purchase of Econazole directly from one or more of the Defendants during the Class Period.  As a result of Defendants' antitrust conspiracy, FWK, through assignor Kerr, paid supra-competitive prices for its Econazole purchases and was injured by the illegal conduct alleged herein.

29.     Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. ("KPH") is a New York corporation with its principal place of business in Gouverneur, New York.  KPH operates retail and online pharmacies in the Northeast under the name Kinney Drugs, Inc. During the Class Period, KPH directly purchased Econazole from one or more of the Defendants. As a result of Defendants' antitrust conspiracy, KPH paid supra-competitive prices for its Econazole purchases, and KPH was injured by the illegal conduct alleged herein.

30.     Plaintiff Rochester Drug Co-Operative, Inc. ("RDC") is a New York corporation with its principal place of business in Rochester, New York.  During the Class Period, RDC purchased Econazole directly from one or more of the Defendants at artificially and unlawfully inflated prices.  As a result of Defendants' antitrust conspiracy, RDC paid supra-competitive prices for its Econazole purchases, and RDC was injured by the illegal conduct alleged herein.

**B.     Defendants**

31.     Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its principal place of business in Bronx, New York.  During the Class Period, Perrigo sold Econazole to purchasers in this District and throughout the United States.  Perrigo sells

- 10 -
REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Econazole pursuant to Abbreviated New Drug Applications ("ANDAs") that were approved by the United States Food and Drug Administration ("FDA") in June 2004.

32.     Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York.  Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli pharmaceutical company.  In 2010, Sun Pharmaceutical Industries Ltd., an Indian pharmaceutical company, acquired a controlling stake in Taro Pharmaceutical Industries, Ltd.  During the Class Period, Taro sold Econazole to purchasers in this District and throughout the United States.  Taro sells Econazole pursuant to ANDAs that were approved by the FDA in November 2002.

33.     Defendant Teligent, Inc. ("Teligent"), formerly known as IGI Laboratories, Inc. ("IGI"), is a Delaware corporation with its principal place of business in Buena, New Jersey.  During the Class Period, Teligent sold generic Econazole to purchasers in this District and throughout the United States.  Teligent sells Econazole pursuant to ANDAs that were approved by the FDA in December 2004 and which it acquired from Prasco, LLC in February 2013.

34.     Defendants and their officers, agents, employees, or representatives have engaged in the conduct alleged in this Complaint while actively involved in the management of Defendants' business and affairs.

**C.     Co-Conspirators**

35.     Various other persons, firms, entities, and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

36.     The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs.  Plaintiffs may amend

- 11 -

this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

      37.    At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

      38.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

      39.    The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## IV.    INTERSTATE TRADE AND COMMERCE

      40.    Defendants are the leading manufacturers and suppliers of Econazole sold in the United States.

      41.    Econazole is produced by or on behalf of Defendants or their affiliates in the United States or overseas.

      42.    During the Class Period, Defendants, directly or through one or more of their affiliates, sold Econazole throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

      43.    The activities of Defendants and their co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

44.     Defendants' and their co-conspirators' conduct, including the marketing and sale of Econazole, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

45.     The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiffs of the benefits of free and open competition in the purchase of Econazole within the United States.

46.     Defendants' agreement to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Econazole, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing Econazole prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## V.     FACTUAL ALLEGATIONS

### A.     Competition Between Generic Drugs Historically Has Been Keen.

#### 1.     Generic drugs should lead to lower prices.

47.     Generic drugs provide a lower-cost but bioequivalent alternative to brand drugs. Before any generic drug can be marketed, the Food and Drug Administration (the "FDA") requires rigorous testing to ensure it has the same strength, quality, safety, and performance as the brand. By law, generics must have the same amount of active ingredient and must be "therapeutically equivalent" to the brand, meaning they must meet exacting bioequivalence testing specifications so patients can expect "equal effect and no difference when [generics are] substituted for the brand name product."[19]

48.     To encourage the production and sale of generic drugs, the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") simplified the

---

[19] FDA, *Drugs@FDA Glossary of Terms*, *available at* http://www.fda.gov/Drugs/ InformationOnDrugs/ucm079436.htm#G.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

regulatory hurdles that generic drug manufacturers have to clear before marketing and selling generic drugs. Instead of filing a lengthy and costly New Drug Application, the Hatch-Waxman Act allows generic drug manufacturers to obtain FDA approval in an expedited fashion.

49.     To obtain marketing approval for a generic drug, an Abbreviated New Drug Application ("ANDA") must be filed with the FDA's Center for Drug Evaluation and Research, Office of Generic Drugs; "abbreviated" because so long as the ANDA includes data showing bioequivalence to the brand, the ANDA sponsor can reference efficacy data supporting approval of the brand (described in the regulations as the "Reference Listed Drug" or "RLD" for short) instead of repeating all the same clinical trials. Upon the FDA's determination that bioequivalence to the brand has been established, the ANDA will be approved and may be marketed in the United States as substitutable with the RLD.

50.     Although equivalent from a safety and efficacy standpoint, generic versions of brand name drugs are priced significantly below their brand counterparts, and because of this, they rapidly gain market share from the brand beginning immediately following launch. Indeed, in every state, pharmacists are permitted (and in many states required) to substitute a generic product for a brand product barring a note from a doctor that the brand product must be dispensed as written.

51.     It is well established in economic literature that competition by generic products should result in lower prices for drug purchasers. In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price largely free from normal competitive market forces. But once the first lower-priced generic enters, a brand drug rapidly loses sales due to automatic pharmacy substitution, and generics capture as much as 80% of the market or more within months of launch. And as more

generics become available, generic prices only decline further due to competition among generics. These cost reductions to drug purchasers were the very legislative purpose behind the abbreviated regulatory pathway for generic approval under the Hatch Waxman Act.

52.    Generic competition, under lawful and competitive circumstances, reduces drug costs by driving down the prices of both generic versions of the brand drug and often the brand drug itself, and every year generic drugs should result in hundreds of billions of dollars in savings to direct purchasers, consumers, and insurers.

53.    A Federal Trade Commission study found that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[20] A mature generic market has several generic competitors. Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature and the basis for competition among manufacturers.[21] Over time, generics' pricing should near the generic manufacturers' marginal costs.

54.    Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug. Generic competition to a single blockbuster brand drug can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others.

---

[20] Federal Trade Commission, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions*, at 8 (Jan. 2010), *available at* https://www.ftc.gov/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff.

[21] *See, e.g.*, Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at* https://www.ftc.gov/reports/authorized-generic-drugs-short-term-effects-long-term-impact-report-federal-trade-commission; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

2.      **Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive.**

55.      Ordinarily, the price for a consumer product is set by the retailer based on the amount the typical consumer is willing to pay.  But because of the unique features of the prescription drug marketplace, prescription drug pricing for most consumers is not determined between the retailer and the consumer.  Rather, because most consumers' prescription drug purchases are reimbursed by public or private health plans, consumer pricing for prescription drugs is often set in reference to reimbursement agreements between these prescription drug payers, *i.e.*, health plans and their prescription benefit managers, and the pharmacies that dispense drugs to the payers' insured customers.

56.      Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs.  WAC prices represent the manufacturer's benchmark or reported list price.  The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume sales.  Manufacturers generally provide their WACs to purchasers or report them to publishers that compile that information for the market.

57.      Generic drug manufacturers may charge different amounts for an equally interchangeable, *i.e.*, therapeutically equivalent, multisource drug.  But manufacturers are usually constrained in their ability to price generic drugs by the Maximum Allowable Cost ("MAC").[22] MAC is a contractually based payment model that, in the private sector, is commonly established by a pharmacy benefits manager ("PBM"), who manages an insurance plan, and that is paid to

---

[22] To define therapeutic categories, MAC pricing typically relies on the FDA's Orange Book, which lists approved prescription drugs and their therapeutic equivalents.  An "A"-rated drug is one that the FDA considers to be therapeutically equivalent to other pharmaceutically equivalent products.  *See* U.S. FDA Website, Orange Book Preface, *available at* https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#tecode.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

the pharmacies within the plan's network.[23]  A MAC price sets the upper limit that a pharmacy

will be paid by the PBM for procuring and dispensing a particular generic medication.

58.    While PBMs usually do not disclose publicly which drugs they subject to MAC

pricing, what the MAC price is, or what factors they apply to set MAC prices, it is believed that

PBMs rely on a wide variety of market-wide pricing information or plan-specific data.[24]  In

recent years, 79% of employer prescription drug plans and 45 state Medicaid programs have

been using MAC prices to control the cost of generic drugs.[25]

59.    MAC prices give pharmacies an incentive to procure and dispense the lowest-

priced drug product available for a particular multisource drug. If a generic drug is subject to

MAC pricing, a pharmacy purchasing a higher-priced generic product will make less profit or

potentially even lose money when it dispenses a higher-priced product.[26]

60.    MAC pricing is neither uniform nor transparent, and it may be subject to frequent

changes.  So whether a generic manufacturer's products are even subject to MAC pricing, or

how that MAC pricing is set for any particular generic drug, is not easy for the manufacturers to

decipher.  PBMs typically exercise control over the selection of generic drugs that will be

subjected to MAC pricing, and they fiercely guard the secrecy of their MAC price lists.[27]

---

[23] Academy of Managed Care Pharmacy, *Where We Stand, Maximum Allowable Cost (MAC) Pricing* (Dec. 2013), *available at* www.amcp.org/Sec.aspx?id=9287.  For the purposes of this Complaint, MAC prices refer solely to prices that limit a pharmacy's reimbursement for generic drugs, not the amounts PBMs charge to the insurance plans, which may also be referred to as a MAC price.  *See* National Community Pharmacists Association, *The Need for Legislation Regarding "Maximum Allowable Cost" (MAC) Reimbursement*, *available at* http://www.ncpa.co/pdf/leg/mac-one-pager.pdf.

[24] *Id.*

[25] Express Scripts, *MAC Pricing Incents More Affordable Rx* (Feb. 24, 2016), *available at* http://lab.express-scripts.com/lab/insights/drug-options/mac-pricing-incents-more-affordable-rx.

[26] *See supra* Academy of Managed Care Pharmacy article.

[27] *See supra* National Community Pharmacists Association article.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Industry groups, like the Academy of Managed Care Pharmacy, actively oppose government regulation of MAC pricing and any efforts to disclose MAC prices or the methods of calculating them.[28]

61.     By setting a ceiling for reimbursement of any particular generic drug at the pharmacy level, MAC prices indirectly affect the price at which generic drug manufacturers may sell their products to direct purchasers.  Because many generic drugs are subject to MAC pricing, generic drug manufacturers have an incentive to price their generic drug products competitively to maintain demand by pharmacies.

62.     MAC pricing can penalize the generic drug manufacturer that raises price on its own when its competitors do not.  A unilateral price increase in a competitive generic drug market that is subject to MAC pricing is likely to send buyers to a lower-priced alternative.

63.     MAC pricing has little effect, however, if generic drug manufacturers collectively increase their prices for a multi-source drug.  First, PBMs generally permit pharmacies – who may be contractually obligated to dispense an unprofitable prescription – to challenge MAC prices under a MAC appeals process.[29]  If the price of a generic drug has been increased by a majority of generic drug manufacturers, then these MAC appeals may be successful in getting the PBM to increase the MAC price allowed.  Second, PBMs typically have a policy of revising MAC prices under certain contingencies.[30]  One large PBM, Express Scripts, for example, states that its MAC price list is frequently updated to reflect "the current market dynamics."[31]

64.     MAC pricing provides yet another reason that Defendants' stark increases in the price of the generic drugs in question are indicative of coordinated pricing activity.  Knowing

---

[28] *See supra* Academy of Managed Care Pharmacy article.

[29] *Id.*

[30] *Id.*

[31] *See supra* Express Scripts article.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

that they hold an overwhelming majority share of the market for these drugs, Defendants had the capacity to dictate the market price and to influence the MAC prices set by PBMs, but only if they acted collectively.  Absent collusion, individual Defendants and co-conspirators could not have increased their prices to the high levels they did (or maintain high prices in the face of a competitor's significantly lower price) without incurring the loss of a significant volume of sales.

**B.     Defendants' Conspired to, Among Other Things, Fix and Raise Econazole Prices.**

      **1.     Defendants' dominance over Econazole sales permitted them to fix prices, and their abrupt price increases are otherwise inexplicable.**

      65.     The market for Econazole is mature, as generic versions have been on the market for years.  In 2015 alone, Defendants' total revenue from direct sales of these products was approximately ███████.[32]  This compares to only ███████ in 2013.

      66.     A mature generic market, such as the market for Econazole, has several generic competitors.  As noted above, because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.  In a market free from collusive activity, over time, generics' pricing would naturally near (and stay near) the generic manufacturers' marginal costs.

---

[32] Revenue, unit sales, and effective prices are obtained from QuintilesIMS Inc. ("IMS Health").  IMS Health is the largest vendor of physicians' prescribing data in the United States and is widely relied upon in the pharmaceutical industry and elsewhere.  As used in this complaint, "effective prices" represent actual transaction prices, as reported by IMS Health. Plaintiffs calculate Defendants' effective prices based on IMS Health's National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices[.]" IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives, at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

Effective prices are calculated to multiple decimals.  For ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precisely calculated price.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

67.     At all times relevant for this lawsuit, there have been at least three manufacturers of Econazole on the market.  Under accepted economic principles of competition, when there are multiple generics on the market, prices should remain at highly competitive, historic levels, and should not increase as they did here absent anticompetitive conduct.  Drastic increases in Econazole prices are themselves suggestive of Defendants' collective market dominance: if they did not already dominate the market, Defendants' pricing excesses would be disciplined because they would lose market share to non-colluding competitors.

**2.      Teligent acquires Econazole from Prasco.**

68.     Teligent entered the market for Econazole after purchasing an ANDA and other assets related to Econazole from Prasco, LLC in February 2013.[33]  Under the terms of the Teligent-Prasco agreement, Prasco continued to distribute Econazole for a period of months following the closing of the agreement.  Twice during that month, the CEO of Teligent attended trade conferences with Perrigo and Taro, where the three primary sellers of Econazole had opportunities to discuss Teligent's entry to the market.[34]

69.     The Econazole acquisition was one of Teligent's "Key Growth Drivers" and Econazole went on to become a central source of Teligent's revenues.

---

[33] IGI Laboratories, Inc., Press Release, IGI Laboratories, Inc. Acquires Econazole Nitrate Cream (Feb. 4, 2013), *available at* https://www.businesswire.com/news/home/20130204005240/en/IGI-Laboratories-Acquires-Econazole-Nitrate-Cream; *see also* DPPs' Heritage-Related Multi-Drug Complaint at ¶ 292 n.50 (noting that MDL Defendant Valeant similarly acquired an ANDA on a different drug from Prasco shortly before large price increases).

[34] ████████████████████████████████████████████████████████

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

70.     The Econazole acquisition came shortly after Jason Grenfell-Gardner joined

Teligent (then known as IGI) as CEO in July 2012.  Grenfell-Gardner previously served in a

number of roles at West-Ward Pharmaceuticals (a subsidiary of Hikma Pharmaceuticals, PLC).

71.     During this period, Teligent—which had in the past focused on contract

manufacturing and product development for other companies—announced its intent to become a

generic pharmaceutical manufacturer.  Its ambitions were not limited to Econazole.  Teligent

touted its strategic plan to enter the market for numerous topical and other generic drugs.  Thus,

when Teligent acquired the right to sell Econazole from Prasco, it was the start of a publicly

announced plan that would place Teligent in direct competition with Taro, Perrigo, and other

MDL Defendants across numerous drugs.

72.     This scenario—where a drug manufacturer plans to enter a market with

established, incumbent manufacturers, and where those manufacturers are competitors or

potential competitors across multiple drugs—is particularly ripe for a "Fair Share" agreement.

Rather than allow competition to drive the price of drugs even lower, manufacturers can instead

agree in advance to "play nice in the sandbox" and keep prices higher.

73.     Other members of Teligent's leadership at the time of the Econazole acquisition

and price increases included:[35]

- Narendra Borkar, the former CEO of Aurobindo Pharma and former CEO of

  Caraco Pharmaceutical Laboratories (now part of Sun);

- Bhaskar Chaudhuri, the former President of Valeant Pharmaceuticals

  International and former General Manager of the Dermatology Division at Mylan.

---

[35] Currently, Teligent's board also includes Carole Ben-Maimon, formerly in leadership
roles at Impax Laboratories, Inc., Qualitest Pharmaceuticals, Inc. (now Par), and Teva
Pharmaceutical USA.

- 21 -

- Damian Finio, who at the time was an executive at Heritage Pharmaceuticals, Inc. and who previously worked with Grenfell-Gardner at West-Ward.

**3.      Defendants' collective market dominance permitted them to collude.**

74.      At the outset of the Class Period, Defendants' dominated the market with approximately a ▮▮▮ share.[36]  During the Class Period, the Defendants continued to dominate the market with approximately a ▮▮▮ share.

75.      In terms of revenue, in 2015, Defendant Perrigo's sales to direct purchasers were roughly ▮▮▮▮▮▮, Defendant Taro about ▮▮▮▮▮▮, and Defendant Teligent about ▮▮▮ ▮▮▮▮.

**4.      Defendants' effective prices were relatively stable before skyrocketing in the Class Period.**

76.      Before the Class Period, the effective prices of Defendants' Econazole remained stable for years, as is typical in a mature market.  From December 2010 through September 2013, *i.e.*, for nearly three years leading up to the price increases, pricing was relatively stable.

77.      As illustrated below, Defendants' effective prices increased sharply around July 2014, shortly after Teligent acquired control of Econazole from Prasco:

---

[36] Market share is calculated in this complaint by reference to IMS unit sales data.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53





REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



78.    **Teligent:** ███████████████████████████████████████

██████████████████████████████████████████████

████████████

79.    In February 2013, Teligent acquired Econazole from Prasco.

80.    In September 2013, Teligent formally launched Econazole under its own label.

81.    ████████████████████████████████████████:

| Product | Price Oct. 2013 | Hike Date | Hike Price | Percentage Increase |
|---------|-----------------|-----------|------------|---------------------|
| ████████ | ████ | ████ | ████ | ████ |
| ████████ | ████ | ████ | ████ | ████ |
| ████████ | ████ | ████ | ████ | ████ |

82.    ██████████████████████████████████:

| Product | Price Jun. 2014 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| ███████ | ███ | ███ | ███ | ███ |
| ███████ | ███ | ███ | ███ | ███ |
| ███████ | ███ | ███ | ███ | ███ |

83.  ████████████████████████████████████████████████
████████████████████████████████████████████████████:

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| ███████ | ███ | ███ | ███ |
| ███████ | ███ | ███ | ███ |
| ███████ | ███ | ███ | ███ |

84.  ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████:

| Product | Price Jun. 2014 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| ███████ | ███ | ███ | ███ |
| ███████ | ███ | ███ | ███ |
| ███████ | ███ | ███ | ███ |

85.  **Perrigo:** ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████.

86.  ████████████████████████████████████████████████
████████████████████:

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

| Product | Price Jun. 2014 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| █████ | ███ | ███ | ███ | ███ |
| █████ | ███ | ███ | ███ | ███ |
| █████ | ███ | ███ | ███ | ███ |

87. ████████████████████████████████████████

████████████████████████████████████████:

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| █████ | ███ | ███ | ███ |
| █████ | ███ | ███ | ███ |
| █████ | ███ | ███ | ███ |

88. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████.

89. **Taro:** ████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████.

90. ████████████████████████████████████████████

████████████████████████████████.

| Product | Price Jun. 2014 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| █████ | ███ | ███ | ███ | ███ |
| █████ | ███ | ███ | ███ | ███ |
| █████ | ███ | ███ | ███ | ███ |

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

91. ███████████████████████████████████

████████████████████:

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|-----------|---------------------|
| ██████ | ████ | ███ | ████ |
| ██████ | ████ | ███ | ████ |
| ██████ | ████ | ███ | ████ |

92. ███████████████████████████████████

█████████████████████████████████████████

████████████████████████:

| Product | Price Jun. 2014 | Price Nov. 2016 | Percentage Increase |
|---------|-----------------|-----------------|---------------------|
| ██████ | ████ | ███ | ███ |
| ██████ | ████ | ███ | ███ |
| ██████ | ████ | ███ | ███ |

93.    Defendants' price increases coincide with increases reported by the Centers for

Medicare & Medicaid Services:

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



**5.     As part of the conspiracy, Defendants increased their WAC benchmarks in lockstep.**

94.     Although MAC pricing has been implemented to discourage unilateral price increases of generic drugs by setting an upper limit, an individual manufacturer's WAC increase influences the actual prices paid by direct purchasers.  This is the case here, where Defendants dominate the Econazole market and raised their WACs to identical prices even though it meant increasing them by as much as 890%.[37]

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 15 gm crm | Perrigo | 45802-0466-35 | $0.79 | $5.80 | 24-Jul-14 | 637% |
| 15 gm crm | Teligent | 52565-0022-15 | $0.82 | $5.80 | 1-Sep-14 | 610% |

---

[37] For ease of reference, WAC prices are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm crm | Taro | 51672-1303-01 | $0.66 | $5.80 | 18-Nov-14 | 779% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 30 gm crm | Perrigo | 45802-0466-11 | $0.69 | $5.80 | 24-Jul-14 | 736% |
| 30 gm crm | Teligent | 52565-0022-30 | $0.72 | $5.80 | 1-Sep-14 | 704% |
| 30 gm crm | Taro | 51672-1303-02 | $0.59 | $5.80 | 18-Nov-14 | 890% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 85 gm crm | Perrigo | 45802-0466-53 | $0.50 | $4.09 | 24-Jul-14 | 719% |
| 85 gm crm | Teligent | 52565-0022-85 | $0.52 | $4.09 | 1-Sep-14 | 688% |
| 85 gm crm | Taro | 51672-1303-08 | $0.42 | $4.09 | 18-Nov-14 | 871% |

6.    **There are no shortages or other market changes that would justify Defendants' price increases.**

95.    During the Class Period, there was no significant increase in the costs of making Econazole, no significant decrease in supply, and no significant increase in demand. Nonetheless, there were extraordinary increases by each of the Defendants in the prices they charged their customers for Econazole. Such price increases in a commodity product for which there were no significant increases in costs or demand and no significant decrease in supply would not have been in each Defendant's unilateral self-interest absent the existence of a cartel.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

96.     Federal law requires mandatory drug shortage reporting for drug manufacturers.[38] Econazole is not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA.  Econazole also does not appear on any archived lists of the American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins from July 3, 2012, through today, nor does it appear on the current list of ASHP Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010).  None of the Defendants reported any drug shortages or supply disruptions to the FDA in explanation for the supra-competitive pricing of Econazole.

97.     Nor does any change in the marketplace explain the rising prices.  At the outset of the Class Period, Defendants' dominated the market with approximately a ▮▮▮ share.  During the Class Period, the Defendants continued to dominate the market with approximately a ▮▮▮ share.

## C.     Defendants Orchestrated Their Conspiracy Through In-Person Meetings and Other Forms of Communication.[39]

98.     During the Class Period, Defendants conspired, combined, and contracted to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Econazole, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Econazole.

99.     Beginning at least as early as July 2014, Defendants collectively caused the price of Econazole to increase dramatically.  Defendants' conduct cannot be explained by normal

---

[38] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 STAT. 995, 1099-1108.

[39] The allegations included in this section pertaining to the NACDS and ECRM are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re: Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

competitive forces.  It was the result of an agreement among Defendants to increase pricing and

restrain competition for the sale of Econazole in the United States.  The agreement was furthered

by discussions held at meetings and industry events hosted by the GPhA, NACDS, and ECRM as

well as other meetings and communications.

      100.    In formulating and effectuating their conspiracy, Defendants engaged in

numerous anticompetitive activities, including, among other things:

(a)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of Econazole in the United States;

(b)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid rigging for Econazole sold in the United States;

(c)    Agreeing during those meetings, conversations, and communications to engage in market and customer allocation or bid rigging for Econazole sold in the United States;

(d)    Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Econazole sold in the United States;

(e)    Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)    Selling Econazole in the United States at collusive and noncompetitive prices; and

(g)    Accepting payment for Econazole sold in the United States at collusive and noncompetitive prices.

      101.    To sustain a conspiracy, conspirators often communicate to ensure that all are

adhering to the collective scheme.  Here, such communications occurred primarily through (1)

trade association meetings and conferences, (2) private meetings, dinners, and outings among

smaller groups of employees of various generic drug manufacturers, and (3) individual private

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

102.    These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price-fixing, and market and customer allocation scheme.

103.    The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[40]  The Plaintiff States have similarly noted the centrality of trade associations and industry conferences in their investigation stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[41]

104.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices and engage in market and customer allocation of Econazole, including, but not limited to, GPhA and the NACDS. In addition, Defendants regularly attended industry events hosted by the ECRM.

---

[40] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[41] Press Release, Conn. AG, Conn. Leads 20 State Coal. Filing Fed. Antitrust Lawsuit against Heritage Pharm., other Generic Drug Cos. (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

105.     The GPhA (now called the Association for Accessible Medicines) is the "nation's leading trade association for manufacturers and distributors of generic prescription drugs. . . ,"[42] GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

106.     GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[43]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

107.     Defendant Perrigo was a regular member of the GPhA during the Class Period, and Defendants Taro and Telligent frequently attended GPhA meetings.  Regular members "are corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[44]

108.     Before and during the Class Period, Doug Boothe, Executive VP and General Manager of Perrigo (2013-2015), and Richard Stec, Perrigo's Vice President of Global Regulatory Affairs (2016) served on the GPhA Board of Directors, along with former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to the price fixing

---

[42] GPhA, Membership, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership.
[43] *Id.*
[44] *Id.*

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

and other anticompetitive activity concerning generic drugs, also served on GPhA's board of directors.[45]

109.    The NACDS is a national trade association representing chain community pharmacies. Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

110.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

111.    At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

112.    ████████████████████████████████████████████
███████.

113.    As further set forth below, meetings and events hosted by the GPhA, NACDS, and ECRM were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.

████████████████████████████████████████████████

████████████████████████████████████

---

[45] *See also* DPPs' Heritage-Related Multi-Drug Complaint Exhibit E (Generic Pharmaceutical Association Board of Directors 2010 to 2017).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



c.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

117.     On April 20-23, 2013, NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives of at least Defendants Perrigo and Taro, including at least the following key executives:

    a.   **Perrigo:** Joseph Papa, Chairman and CEO; Doug Boothe, President of Generics Division; Jim Tomshack, Sr. VP of Sales; and

    b.   **Taro:** Jim Kedrowski, Interim CEO; Michael Perfetto, Chief Commercial Officer for Generic RX/OTC, US and Canada; Ara Aprahamian, VP of Sales & Marketing; Michael Perfetto, CCO Generics RX/OTC US and Canada.



119.     On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by at least the following representatives from Defendants, who were the key executives for generic drug sales and pricing:

    a.   **Perrigo:** H. James Booydegraaff, Associate Director, Marketing; Andrea Felix, National Account Executive; Kara Goodnature, Marketing Manager; Ori Gutwerg, National Account Executive; Pete Haakenstad, National Account Manager; Katie McCormack, National Account Manager; Richard McWilliams,

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Senior Vice President & General Manager; Tony Polman, National Account Executive; and

    b.   **Taro:** Ara Aprahamian, Vice President, Sales & Marketing; Sheila Curran, Vice President, Sales Operations; Howard Marcus, VP Sales & Marketing; Michael Perfetto, Group Vice President and Chief Commercial Officer of the Generic RX Business; Doug Statler, Sr. Director/Head of Sales.



REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



122.

c.

123.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale,

Arizona. NACDS's 2014 annual meeting was attended by at least the following representatives

from Defendants, who were key executives for generic drug sales and pricing:

    a.  **Perrigo:** Doug Boothe, President Generics Division; Tony Polman, National

        Account Executive; John Wesolowski, Acting General Manager; and

    b.  **Taro:** Ara Aprahamian, Vice President, Sales & Marketing; Michael Perfetto,

        Chief Commercial Officer Generic RX/OTC, US and Canada;

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



125.   On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by representatives from Defendants, including at least the following key executives for generic drug sales and pricing:

    a.  **Perrigo:** Doug Boothe, President Generics Division; H. James, Booydegraaff Associate Director, Marketing; Ori Gutwerg, National Account Executive; Katie McCormack, National Account Manager; Richard McWilliams, Senior Vice President & General Manager; Kristine Norman, Account Executive; Tony Polman, National Account Executive; John Wesolowski, Acting General Manager; and

    b.  **Taro:** Ara Aprahamian, Vice President, Sales & Marketing; Scott Brick, Manager, National Accounts; Kevin Kriel, Executive Director, Marketing & Business Development, US and Canada; Christopher Urbanski, Director, Corporate Accounts;

- 39 -
REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53



REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

███████████████████████████████████████████████

█████████████████████████

129.    On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida. NACDS's 2015 annual meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

    a.  **Perrigo:** Doug Boothe, President Generic Division; Christopher Kapral, SVP, Consumer Healthcare Sales; Andy Kjellberg, VP Consumer Healthcare Sales; Mark, Walin, VP Consumer Healthcare Sales; Michael Yacullo, VP Consumer Healthcare Sales; and

    b.  **Taro:** Ara Aprahamian, VP Sales & Marketing; Michael Perfetto, CCO Generics RX/OTC US and Canada.

█████████████████████████████████████████

████████████████████████████

███████████████████████████████████████████

███████████████████████████

███████████████████████████████████████████

███████████████████████████████

131.    On August 22-25, 2015, NACDS held its 2015 Total Store Expo at the Denver Convention Center in Denver, Colorado.  NACDS's August 2015 Total Store Expo was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

    a.  **Perrigo:** Doug Boothe, President Generic Division; Christopher Kapral, SVP, Consumer Healthcare Sales; Andy Kjellberg, VP Consumer Healthcare Sales;

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

Mark, Walin, VP Consumer Healthcare Sales; Michael Yacullo, VP Consumer Healthcare Sales; and

b.  **Taro:** Ara Aprahamian, VP Sales & Marketing; Alex Likvornik, Sr. Director, Strategic Pricing & Marketing;



133.    Defendants continued to attend trade association meetings and conference throughout 2016, including: (i) NACDS's 2016 annual meeting at The Breakers, Palm Beach, Florida on April 16-19, 2016; and (ii) NACDS's 2016 Total Store Expo at the San Diego Convention Center in San Diego, California on August 19-22, 2016.

134.    As uncovered in the Plaintiff States' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

opportunities to discuss and share upcoming bids, specific generic drug markets, pricing

strategies and pricing terms in their contracts with customers.[46]

135.    In conjunction with meetings at conferences and trade shows, representatives of

generic drug manufacturers get together separately, in more limited groups, allowing them to

further meet face-to-face with their competitors and discuss their business.  In fact, high-level

executives of many generic drug manufacturers get together periodically for what at least some

of them refer to as "industry dinners."[47]

136.    A large number of generic drug manufacturers, including Defendants Taro and

Teligent are headquartered or have major offices in close proximity to one another in New

Jersey, New York, and eastern Pennsylvania, giving them easier and more frequent opportunities

to meet and collude.  For example, in January 2014, at a time when the prices of a number of

generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including

CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a

steakhouse in Bridgewater, New Jersey.

137.    Generic drug manufacturer employees also get together regularly for what is

referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings

and dinners.  During these GNOs, meetings and dinners, these employees meet with their

competitors and discuss competitively sensitive information.  For example, several different

GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS

conference in August.

---

[46] *See, e.g.*, Plaintiff States' Consolidated Amended Complaint ("Plaintiff States'
Heritage-Related Multi-Drug Complaint"), No. 2:17-cv-03768, ECF 14 (public version) & ECF
15 (under seal version) (filed June 18, 2018), at ¶¶ 50-52.

[47] *Id.* at ¶¶ 53-60.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

138.     Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

139.     Defendants also routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

140.      Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

1.     **Investor communications demonstrate Defendants' intent to fix and maintain supra-competitive prices to realize record profits.**

141.     Defendants' public statements and admissions in their investor communications show that Defendants realized record revenues during the Class Period and emphasize a commitment to increasing generic pharmaceutical prices as well as maintaining them at supra-competitive levels.

142.     **Teligent.**  According to Teligent's 2015 Annual Report, Econazole accounted for 45% of the company's total revenues in 2015 and 38% in 2014.

143.     On October 29, 2013, during an earnings call, President and CEO of Teligent Jason Grenfell-Gardner noted that "there are certainly some markets there which had seen price

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

appreciation. And that's a trend that's been happening throughout the topical market in various ways. . . We hope at this point that trend will continue."

144.    On July 24, 2014—just as Econazole prices were beginning to rise—Jason Grenfell-Gardner, President and CEO of what was then IGI Laboratories, stated on a second quarter earnings call that: "[P]rices go up and prices down. What we as a management team have to do is to ensure that we remain alert and we try to maximize the value we can."

145.    On October 24, 2014, during an earnings call Grenfell-Gardner stated that maximizing value through price increases helped to significantly increase the company's revenues: "Year-to-date in 2014, we recognized $9.3 million in sales of IGI label products, that's an increase of 123% over the same period last year. This growth has been driven partially . . . from significant price increases for core products in the portfolio."

146.    During a February 27, 2014 third quarter earnings call, Teligent's CFO Jennifer Collins noted that gross margins had increased and that revenue was up due in part to revenue from Econazole.

147.    Grenfell-Gardner and Jenniffer Collins, Teligent's CFO, continued to recognize the "positive market conditions" for Econazole in the April 28, 2015, earnings call for the first quarter of 2015. The company's 56% increase in revenue over the same period in 2014 was attributed by Collins to Econazole, noting that the product represented 53% of the company's total revenue for the first quarter of 2015.

148.    **Perrigo.** On October 31, 2013, Perrigo's CFO Judy L. Brown stated that: "Pricing initiatives were well received this quarter."

149.    On May 7, 2014, Perrigo's Chairman and CEO Joseph C. Papa stated that he "absolutely agree[d] that there are some opportunities for us in different business segments."

150.    On August 14, 2014, Perrigo's Chairman and CEO Joseph C. Papa stated during an earnings call that: "do I think there are some opportunities on pricing in the Rx category, the answer is yes."

151.    Perrigo stated in its 2015 Annual Report that it intended to: "[B]roaden[] leadership in our core base business of extended topical products with limited competition and attractive margins.

152.    On February 7, 2015, Papa stated during an earnings call that: "On the question of pricing . . . I will say the Rx side does have, as I sit here today, the greatest upside." Papa also noted that Perrigo had "record results, growing sales 12% with an adjusted operating margin of 46%."

153.    Later during the same call, industry analyst Gregg Gilbert from Deutsche Bank commented that: "Obviously, the generic side of your business and many other companies has benefited from an enhanced pricing environment, if we could call it that, in the last several years."

154.    In 2014 and 2015, Perrigo reported rising profits and record sales in its United States generics business due in part to "pricing initiatives."

155.    **Taro.** During a November 10, 2014, earnings call, Taro CEO Kal Sundaram attributed the company's significant growth to price increases:

> Our sales and earnings growth is attributable to upward price adjustments and prudent life cycle management of our portfolio, while our overall volumes remain relatively constant.
>
> …
>
> In 2010, as per IMS data, Taro was ranked third among the genetic [sic] dermatology companies in USA. In terms of sales, now it is ranked number one for the past three years. U.S. remains the dominant market for Taro. Taro's earnings per share also has

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

grown 50% CAGR, compounded annual growth, since 2010. Taro's sales and earnings growth is attributable to upward price adjustments and the prudent life cycle management of our product portfolio while our overall volumes remain relatively constant and we remain cautious about the long-term sustainability of these prices.

…

Again market to volume fluctuations can happen for very different reasons as and when a new generation product comes, it will have impact on the older generation product. And once again I am saying generics remain to be sort of, what do you say cost value for money and competitive. I don't think there will be any significant—we have seen any significant impact of volume shifting because of price adjustments.

156.   On the same call, Taro Group Vice President and CFO Michael Kalb noted:

Net sales for Q2 were $251 million, up 22% over Q2 last year. As we anticipated in last quarter's earnings release we are realizing the benefits of the previous quarter's price adjustments in the current quarter. Gross profit increased 24% to $198 million year-on-year resulting in a 130 basis points expansion in our gross margins to 79%.

157.   Sundaram has also emphasized Taro's strategy of relying upon high-priced generics in a May 27, 2016 earnings call, stating that: "We are a specialty generic company, so by definition, our portfolio will be sort little narrow, but set of focused.  [sic]  We operate in niche market[s], smaller volumes, but better priced."

158.   On September 13, 2016, *The Economic Times* quoted an analyst as stating that: "While Taro has been gaining approvals for its products, a significant portion of its revenue growth has come from price increases."[48]

---

[48] Divya Rajagopal, *Taro Pharmaceutical Industries under anti-trust scanner for price hike*, THE ECONOMIC TIMES (Sept. 13, 2016), *available at* http://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/taro-pharmaceutical-industries-under-anti-trust-scanner-for-price-hike/articleshow/54302910.cms.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

159.    Taro reported rising revenues in its United States generics business during the

Class Period.

### 2.    Industry commentary indicates collusion is a plausible explanation for the increase in Econazole price

160.    Comments from industry analysts suggest that collusion is a plausible explanation

for the increase in Econazole, and other generic pharmaceutical, prices.  For instance, Richard

Evans at Sector & Sovereign Research wrote:

> A plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation.[49]

161.    According to one study, since 2013 approximately one in 19 generic drugs sold in

the United States have undergone major price hikes that may be consistent with collusion:

> Fideres Partners LLP, a London-based consultancy that works with law firms to bring litigation against companies, reported "anomalous pricing patterns" in scores of generic drugs sold in the U.S. from 2013 to 2016.  It identified 90 medicines whose prices rose at least 250 percent over the three-year period and were increased by at least two drug companies around the same time, even though there was no obvious market reason for the increases. The average price jump among the 90 drugs was 1,350 percent, Fideres found.
>
> "I don't think the public or even the politicians in the U.S. have any idea just how widespread and extreme the phenomenon is," said Alberto Thomas, one of Fideres's founders.[50]

---

[49] *See* Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?*, WALL STREET JOURNAL (Apr. 22, 2015), *available at* http://blogs.wsj.com/pharmalot/2015/ 04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[50] Liam Vaughan and Jered S. Hopkins, *Mylan, Teva Led Peers in "Anomalous" Price Moves, Study Says*, BLOOMBERG (Dec. 22, 2016) *available at* https://www.bloomberg.com/news/articles/2016-12-22/widespread-drug-price-increases-point-to-collusion-study-finds

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

162.     Another study concluded that in 2014, "292 generic medication listings went up by 10% or more, 109 at least doubled in price and 14 went up by ten or more times in price that year."[51] The GAO Report also noted similar "extraordinary price increases" across many generic drugs in recent years that could not be linked to any particular cause.

163.     Pennsylvania physicians through the Pennsylvania Medical Society called on state and federal governments to investigate surging generic prices, believing anticompetitive conduct was to blame:

> According to Robert Campbell MD, chair of Physicians Against Drug Shortages and immediate past president of the Pennsylvania Society of Anesthesiologists, surging prices have hit hundreds of mainstay generics, including anesthetics, chemotherapeutic agents, antibiotics, and nutritional intravenous solutions. He believes the surging prices are a result of anti-competitive behavior.[52]

**D.   Defendants' Conduct in Generic Drug Pricing Is Under Investigation by the United States Congress, the DOJ, and the State Attorneys General.**

**1.   Congress launched an investigation in response to news reports of a dramatic rise in price of certain generic drugs.**

164.     As noted above, in January 2014 the NCPA sent correspondence to the United States Senate HELP Committee and the United States House Energy and Commerce Committee requesting hearings on significant spikes in generic pharmaceutical pricing.

165.     On October 2, 2014, Senator Bernie Sanders (I-VT), Chair of the Subcommittee on Primary Health and Aging, Senate Committee on Health, Education, Labor and Pensions, and Representative Elijah E. Cummings (D-MD), the Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers requesting information

---

[51] David Belk, MD, *Generic Medication Prices*, *available at* http://truecostofhealthcare.net/generic_medication_prices/.

[52] Pennsylvania Medical Society, Press Release, *Rising Generic Drug Costs Have Physicians Raising Red Flags* (Feb. 5, 2016), *available at* http://www.prnewswire.com/news-releases/rising-generic-drug-costs-have-physicians-raising-red-flags-300216006.html.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

about the escalating prices of generic drugs used to treat everything from common medical conditions to life-threatening illnesses.[53]

166.     Senator Sanders and Representative Cummings issued a joint press release, advising "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses."  They noted the "huge upswings in generic drug prices that are hurting patients" are having a "'very significant'" impact threatening pharmacists' ability to remain in business.[54]

167.     On February 24, 2015, Senator Sanders and Representative Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[55]  The OIG responded to the request on April 13, 2015, advising it would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [Average Manufacturer Pricing] exceeded the specified inflation factor."[56]

---

[53] U.S. Senator Bernie Sanders Website, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at*: https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[54] *Id.*

[55] Letter from Bernie Sanders, United States Senator, and Elijah  Cummings, United States Representative, to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[56] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders (Apr. 13, 2015), *available at* http://www.sanders.senate.gov/download /oig-letter-to-sen-sanders-4-13-2015?inline=file.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

168.    In August 2016, the United States GAO issued its report finding "extraordinary price increases" on many generic pharmaceuticals including Econazole.[57]

**2.    The DOJ launched a broad criminal investigation into anticompetitive conduct by generic drug manufacturers.**

169.    The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry on or around November 3, 2014.  The DOJ also empaneled a grand jury in this District at about the same time.

170.    Initial reports suggest that, at the beginning, the DOJ's probe was focused on two generic drugs: digoxin and doxycycline.  However, news reports, court filings, and other public statements have confirmed the sweeping nature of the DOJ's investigation.  Reportedly, the DOJ believes price-fixing between makers of generic pharmaceuticals is widespread, and its investigation could become the next auto parts investigation, which is the DOJ's largest prosecution to date.[58]  According to sources cited by Bloomberg, the DOJ investigation already "spans more than a dozen companies and about two dozen drugs."[59]

171.    At least Defendants Perrigo and Taro have been ensnared in the DOJ's ongoing probe.

172.    **Perrigo**: On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical

---

[57] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 2016), *available at* http://www.gao.gov/assets/680/ 679055.pdf.

[58] Joshua Sisco, *DoJ believes collusion over generic drug prices widespread—source*, POLICY AND REGULATORY REPORT (June 26, 2015), available at: http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.gg

[59] David McLaughlin and Caroline Chen, *U.S. Charges in Generic Drug Probe to be Filed by Year-End*, BLOOMBERG (Nov. 3, 2016), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

industry."[60]  Perrigo also noted that: "As has been previously disclosed by a number of companies, the Antitrust Division has been looking at industry-wide pricing practices."

173.     **Taro:** In an SEC filing, dated September 9, 2016, Taro disclosed that on the previous day it "and two senior officers in Taro's commercial team, received grand jury subpoenas from" the DOJ, "seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[61]  In a November 2016 earnings call, Taro's CEO Kal Sundaram noted that: "Our understanding is that the subpoenas relate to the same industry-wide investigations into the generic industry that have been going on since 2014."  In an SEC filing dated June 22, 2017, Taro noted that "[c]ertain current and former officers in Taro U.S.A.'s commercial team have also received related subpoenas."

174.     Sun, which owns a majority stake in Taro, also received a grand jury subpoena as part of the DOJ's generics probe.[62]  Reportedly, the DOJ asked Sun for documents related to employee and corporate records and communications with competitors.[63]

175.     Defendants are not alone.  Numerous other generic manufacturers have likewise received subpoenas in connection with the DOJ and the Plaintiff States' broad investigations into

---

[60] Perrigo Website, Press Release, *Perrigo Discloses Investigation* (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[61] Taro, SEC Form 6-K (Sept. 9, 2016).

[62] David McLaughlin and Caroline Chen, *U.S. Charges in Generic Drug Probe to be Filed by Year-End*, BLOOMBERG (Nov. 3, 2016), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[63] Zeba Siddiqui, *India's Sun Pharma Gets U.S. Subpoena Over Generic Drugs Pricing*, REUTERS (May 28, 2016), *available at* http://www.reuters.com/article/sun-pharm-usa-idUSL4N18P00X.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

anticompetitive conduct in the generic drug industry.[64]  Additionally, some of these generic

manufacturers have disclosed that search warrants have been executed or that certain employees

have been separately subpoenaed as part of these ongoing probes.

176.    The fact that these companies received subpoenas from a federal grand jury is

significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division

Manual.  Section F.1 of that chapter notes that when deciding whether to request the initiation of

a grand jury investigation "staff should consider carefully the likelihood that, if a grand jury

investigation developed evidence confirming the alleged anticompetitive conduct, the Division

would proceed with a criminal prosecution."[65]  The staff request needs to be approved by the

relevant field chief and is then sent to the Antitrust Criminal Enforcement Division.[66]  "The

DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the

Director of Criminal Enforcement will make a recommendation to the Assistant Attorney

General.  If approved by the Assistant Attorney General, letters of authority are issued for all

attorneys who will participate in the grand jury investigation."[67]  "The investigation should be

conducted by a grand jury in a judicial district where venue lies for the offense, such as a district

from or to which price-fixed sales were made or where conspiratorial communications

occurred."[68]

177.    Receipt of federal grand jury subpoenas is an indication that antitrust offenses

have occurred.

---

[64] *See also* DPPs' Heritage-Related Multi-Drug Complaint Exhibit C (List of Generic
Drug Manufacturers Known to Have Received a DOJ Subpoena Relating to Anticompetitive
Conduct in the Generic Drug Industry).

[65] DOJ, ANTITRUST DIVISION MANUAL (5th ed. 2015) at III-82.

[66] *Id.*

[67] *Id.* at III-83.

[68] *Id.*

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

178.    That a target has reportedly applied for leniency is also significant.[69]  As the DOJ

notes on its web site (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-

divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal
> violation of the antitrust laws before receiving a conditional
> leniency letter?**
>
> Yes. The Division's leniency policies were established for
> corporations and individuals "reporting their illegal antitrust
> activity," and the policies protect leniency recipients from criminal
> conviction. Thus, the applicant must admit its participation in a
> criminal antitrust violation involving price fixing, bid rigging,
> capacity restriction, or allocation of markets, customers, or sales or
> production volumes, before it will receive a conditional leniency
> letter. Applicants that have not engaged in criminal violations of
> the antitrust laws have no need to receive leniency protection from
> a criminal violation and will not qualify for leniency through the
> Leniency Program.

The DOJ further provides that the leniency applicant must also satisfy the following condition,

among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is

truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id.*

179.    The DOJ's first charges were made on December 12, 2016, against two generic

industry executives (Glazer and Malek) with criminal counts related to price collusion for

generic doxycycline hyclate and glyburide.  *See United States of America v. Jeffrey A. Glazer*,

No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-

00508-RBS (E.D. Pa.).

---

[69] Leah Nylen and Josh Sisco, *Generic drug investigation started small before ballooning
to dozen companies*, MLEX (Nov. 4, 2016) ("While the Justice Department didn't have a
whistleblower at the beginning of the investigation, it is understood that [in the summer of 2016]
a company applied for leniency, which grants full immunity to the first company to come
forward and admit to cartel violations."), *available at*
http://www.mlex.com/GlobalAntitrust/DetailView.aspx?cid=841053&siteid=191&rdir=1.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

180.   These cases allege that these former senior executives of generic drug maker Heritage Pharmaceuticals Inc. violated Section 1 of the Sherman Act by participating in conspiracies to fix prices, rig bids and allocate customers for generic glyburide and doxycycline. On January 9, 2017, both Glazer and Malek pleaded guilty to the charges.  The DOJ charges mention that Glazer and Malek's co-conspirators included "individuals that [Glazer] supervised at his company and those he reported to at his company's parent[.]"[70]  Sentencing for both Glazer and Malek was originally set for April 2017 but was later rescheduled to September 2017 as they continue to cooperate with the DOJ.  Evidence unearthed in the Plaintiff States' action shows that Malek compiled a large list of generic drugs and instructed employees to contact competitors to reach agreement to increase prices and engage in market and customer allocation, and that some of its competitors were willing to reach such agreement.

181.   The DOJ has intervened in MDL 2724 as well as numerous civil antitrust actions alleging price-fixing, bid rigging, and market and customer allocation of generic pharmaceuticals stating that these cases overlap with the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action related to the generic pharmaceutical propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Glazer and Malek] informations that were unsealed."[71]  The DOJ filed a brief with the United States Judicial Panel on Multidistrict Litigation noting that, "The complaints in those civil cases – which typically allege

---

[70] Transcript of Jan. 9, 2017 Plea Hearing, *United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS, ECF 24 at 19 (E.D. Pa.).  A similar statement appears in the transcript from Malek's plea hearing.

[71] *See* Transcript of Hearing, *FWK Holdings, LLC v. Actavis Elizabeth, LLC*, No. 16-cv-9901, ECF 112 (S.D.N.Y. Feb. 21, 2017).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug – overlap significantly with aspects of the ongoing criminal investigation."[72]  As noted above, the DOJ also filed a motion for a stay of discovery in MDL 2724 stating that: "Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue here)."[73]

182.    The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines.  The Division's investigation into the generics market, however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[74]

**3.      Led by the State of Connecticut, the Plaintiff States launched their own investigation of antitrust violations in the generic drug industry.**

183.    The Plaintiff States' action was filed just days after the DOJ filed its first criminal charges against two former executives of Heritage Pharmaceuticals.  According to the Plaintiff States' CAC, the information developed through its investigation uncovered evidence of a broad,

---

[72] *See* Memorandum of Amicus Curiae United States of America Concerning Consolidation, *In re: Generic Digoxin and Doxycycline Antitrust Litig.*, MDL No. 2724, ECF 284 (J.P.M.L. Mar. 10, 2017).

[73] *See* Intervenor United States' Motion to Stay Discovery, *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

[74] DOJ Website, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

well-coordinated, and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States.[75]

## VI.    THE EXISTENCE OF THE FAIR SHARE AGREEMENT WITHIN THE GENERIC DRUG INDUSTRY AND AS TO ECONAZOLE IS SUPPORTED BY OTHER FACTORS

184.    Because Defendants' anticompetitive conduct constitutes a conspiracy to fix prices and engage in market and customer allocation, which is a *per se* violation of Section 1 of the Sherman Antitrust Act, Plaintiffs need not define a relevant market.  However, there are features of the industry relevant to this case that show both (i) that the industry is susceptible to collusion and (ii) that the price increases were in fact the result of collusion and not the result of conscious parallelism.

185.    In addition to the data analysis and conspiracy evidence set forth herein, other factors support the existence of the Fair Share Agreement as to Econazole.

1) the sweeping ongoing investigations by the DOJ and the Plaintiff States' of "pervasive and industry-wide" collusion among many generic pharmaceutical manufacturers, as well as other public reports indicating widespread collusion;[76]

2) frequent communications and meetings among generic drug manufacturers' employees including the Defendants here;

3) factors showing that the generic pharmaceutical industry is susceptible to collusion;[77] and

---

[75] Plaintiff States' Heritage-Related Multi-Drug Complaint, No. 2:17-cv-03768, ECF 14 (public version) & ECF 15 (under seal version) (filed June 18, 2018), at ¶ 11 ("the conduct is pervasive and industry-wide and the schemes identified herein are part of a larger, overarching understanding about how generic manufacturers fix prices and allocate markets to suppress competition").

[76] Plaintiff States' Heritage-Related Multi-Drug Complaint at ¶ 11; *see also id.* at Exhibit B (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry); *id.* at Exhibit C (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena and/or CID Relating to Anticompetitive Conduct in the Generic Drug Industry).

[77] *Id.* at Exhibit F (Summary of Economic Factors Indicating Collusion in the Generic Drug Industry).

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

4) investor communications as set forth herein reflecting, among other things, that Defendants' profits increased during the relevant time period.

186.    Through their market dominance, Defendants have been able to substantially foreclose the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs and the proposed Class members inflated prices above competitive levels for Econazole through unlawful price collusion.

## VII.    CLASS ACTION ALLEGATIONS

187.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this action on behalf of a Class defined as:

> All persons or entities that directly purchased Econazole (generic econazole nitrate 1% cream (15, 30, or 85 gm)) from one or more of the Defendants in the United States and its territories and possessions at any time during the period from July 2014 through the present (the "Class Period").

> Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all governmental entities.

188.    Members of the Class are so numerous that joinder is impracticable.  Plaintiffs believe that there are dozens of Class members, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.  Further, the Class members are readily identifiable from information and records maintained by Defendants.

189.    Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other Class members, and there are no material conflicts with any other member of the Class that would make class certification inappropriate.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

190.    Plaintiffs will fairly and adequately protect and represent the interests of the Class and Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

191.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

192.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.  Thus, determining damages with respect to the Class as a whole is appropriate.  The common applicability of the relevant facts to claims of Plaintiffs and the proposed class is inherent in Defendants' wrongful conduct, because the overcharge injuries incurred by Plaintiffs and each member of the proposed class arose from the same collusive conduct alleged herein.

193.    The common legal and factual questions do not vary among Class members and may be determined without reference to individual circumstances, and include, but are not limited to, the following:

(a)    Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to eliminate competition and thereby increase the prices of Econazole in the United States;

(b)    The duration and extent of the alleged contract, combination, or conspiracy between and among Defendants and their co-conspirators;

(c)    Whether Defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

(d)    The effect of the contract, combination, or conspiracy on the prices of Econazole in the United States during the Class Period;

(e)    Whether Defendants' conduct caused supra-competitive prices for Econazole;

(f)    Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiffs and other members of the Class; and

(g)    Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

194.    Treatment as a class action is the superior method for the fair and efficient adjudication of this controversy, as it will permit numerous similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, avoiding unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding as a class action, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

195.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.   ANTITRUST INJURY

196.    During the Class Period, Plaintiffs and Class members directly purchased Econazole from Defendants.  Because of the Defendants' anticompetitive conduct, Plaintiffs and Class members were forced to pay more for Econazole than they otherwise would have, and thus have suffered substantial overcharge damages at the hands of Defendants.  This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

197.    Defendants' unlawful conduct has successfully eliminated competition in the market, and Plaintiffs and Class members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants.  The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

198.    Defendants, through their unlawful conduct alleged herein, reduced competition in the Econazole market, increased prices, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges.

199.    Because Defendants' anticompetitive conduct is ongoing, Plaintiffs and the Class continue to pay supra-competitive prices for Econazole through the present.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

## IX.    CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN ACT

200.    Plaintiffs repeat and re-allege the foregoing as though fully set forth herein.

201.    In violation of Section 1 of the Sherman Antitrust Act, Defendants entered agreements with one another concerning the pricing of Econazole in the United States.  This conspiracy was *per se* unlawful price-fixing.

202.    Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts were intentional, were directed at the sales of Econazole in the United States, and had a substantial and foreseeable effect on interstate commerce by raising and fixing Econazole prices throughout the United States.

203.    The conspiracy had its intended effect, because Defendants have benefited—and continue to benefit—from their collusion and the elimination of competition, both of which artificially inflated the prices of Econazole.

204.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

    a.    Prices charged to and paid by Plaintiffs for Econazole were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

    b.    Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the sale of Econazole in the United States market; and

    c.    Competition in establishing the prices paid for Econazole was unlawfully restrained, suppressed, or eliminated.

205.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property in that they have paid more for Econazole than they otherwise would have paid in the absence of Defendants' unlawful conduct.

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

206.    Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

207.    There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

208.    Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class members pray for relief from this Court and request:

A.    Certification as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.    Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.    A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

D.    An award to Plaintiffs and Class members of pre-judgment and post-judgment interest at the highest legal rate provided by law from and after the date of service of the first-filed Complaint in this action;

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

E.    An award to Plaintiffs and Class members of the costs of this suit, including

reasonable attorney fees; and

F.    An award of any further relief as the Court deems just and proper.

## XI.    JURY TRIAL DEMANDED

Plaintiffs hereby request a jury trial on all claims so triable.

Dated December 21, 2018

NASTLAW LLC

Dianne M. Nast (PA Bar No. 24424)
Erin C. Burns (PA Bar No. 89742)
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
215-923-9300
215-923-9302 (fax)
dnast@nastlaw.com
eburns@nastlaw.com

*LEAD AND LIAISON COUNSEL*

BERGER & MONTAGUE P.C.
David F. Sorensen
Candice J. Enders
Zachary D. Caplan
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000
dsorensen@bm.net
cenders@bm.net
zcaplan@bm.net

KAPLAN FOX & KILSHEIMER LLP
Robert N. Kaplan
Elana Katcher
850 Third Avenue
New York, New York 10022
(212) 687-1980
rkaplan@kaplanfox.com
ekatcher@kaplanfox.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
David S. Nalven
55 Cambridge Parkway, Suite 301
Cambridge, Massachusetts 02142
617-482-3700
tom@hbsslaw.com
davidn@hbsslaw.com

Barbara A. Mahoney
1918 8th Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292
bmahoney@hbsslaw.com

NUSSBAUM LAW GROUP P.C.
Linda P. Nussbaum
Bart Cohen
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
(917) 438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53

ROBERTS LAW FIRM P.A.
Michael L. Roberts
20 Rahling Circle
Little Rock, Arkansas 72223
(501) 821-5575
mikeroberts@robertslawfirm.us

*DIRECT PURCHASER PLAINTIFFS' STEERING COMMITTEE*

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT TO MDL 2724 PTO 53